**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------- X

DIANNA TOOMEY,                                   :
                                             :    Civil Action No.
                Plaintiff,    :
   v.                                     :
                                             :    **COMPLAINT**
ONE EQUITY PARTNERS,                             :
                                             :
                Defendant.    :    **Jury Trial Demanded**
--------------------------------------------------------- X

Plaintiff Diana Toomey ("Toomey"), by and through counsel, Wigdor LLP, brings this
Complaint against One Equity Partners ("OEP" or the "Firm"), and hereby alleges as follows:

**PRELIMINARY STATEMENT**

1.       Toomey came to work at OEP in 2022 with a brilliant track record as an
Executive Assistant and 20 years of experience.  Indeed, she had excelled in a wide variety of
challenging and prestigious work environments in the past and quickly proved herself to be a
valuable member of the team at OEP.  Indeed, her performance was lauded – repeatedly and in
writing – and she received bonuses, raises and gifts in recognition of her superior work.

2.       Unfortunately, however, Toomey's excellent performance could not overcome the
discriminatory attitudes of both her colleagues and the Company's top management.  Indeed,
throughout her time at OEP, Toomey was subjected to and observed a litany of inappropriate and
discriminatory comments and conduct.  These comments and conduct, which evidenced blatant
discrimination on the basis of gender, race, ethnicity and heritage, includes, but is far from
limited to, the following:

- Dick Cashin ("Cashin"), the President of OEP at the time of
  Toomey's hire (and current Chairman) routinely made misogynistic
  and harassing comments about the women at the Company;

- Cashin frequently espoused his belief that men are superior to women, stating that he preferred not to hire women with intellectually demanding jobs, like jobs in Investor Relations and that OEP should only hire women (particularly mothers) for "unintellectual jobs" like the one held by Toomey;

- Cashin – in front of the entire Company – openly espoused the belief that women are intellectually inferior, saying that "women cannot do better than men in real schools, like Harvard," and that "men must outperform women;"

- Cashin often subjected Toomey to unwanted physical touching;

- Cashin regularly approached Toomey's desk and asked, "Dianna, don't we prefer skinny EAs over fat EAs?;"

- During an employee's birthday celebration with cupcakes on the 19th floor, again in front of the entire firm, Cashin stated, "Don't we prefer a thin Maureen [O'Connell] over a fat Maureen [O'Connell]?;"

- Like Cashin, OEP's current president, Greg Belinfanti ("Belinfanti") is also a misogynist who was open about his discriminatory treatment of women;

- Belinfanti made repeated comments such as, "I would never meet alone with women" and "I would never meet 1-1 with a woman with a closed door.  That is just an invitation to a lawsuit;"

- Belinfanti would only allow women to enter a short distance into his office.

- Belinfanti would not ride with women in cars alone – on one occasion he left an OEP AE in tears after he kicked her out of a ride service that had been paid for by the Firm because he would not be in a car with a woman;

- On several occasions, Toomey's colleague, Maureen O'Connell ("O'Connell") described Arab-Americans as "cheap" and "disgusting;"

- O'Connell made discriminatory comments about Lebanese food and people, including, "Lebanese food is disgusting like the people, I don't eat terrorist food and Greg [Belinfanti] doesn't like it either;"

- O'Connell referred to Toomey as a "dirty terrorist;"

- When Toomey confronted O'Connell about her discriminatory behavior, O'Connell responded with threats such as "Mind your business, bitch," or "I'll beat the shit out of you, stupid Arab;"

- O'Connell regularly referred to Toomey as a "bitch;"

- O'Connell and another EA, Kim Porreca ("Porreca") told Toomey that she was only hired because "senior management didn't want any young, beautiful women working [at the Company] for fear of temptation;"

- O'Connell also referred to Jewish people as cheap, and even called Partner David Lippin ("Lippin") a "Cheap Jew;"

- O'Connell referred to Belinfanti as a "cheap Jamaican;"

- O'Connell stated that another Black employee, Jessica Bernard ("Bernard"), faked a family member's illness "to go on an extended vacation because that's what her people [i.e., people of color] do."

3.     Despite the fact that OEP has no Human Resources ("HR") department, Toomey complained on numerous occasions to anyone who would listen about the sexist and racist bullying she experienced at OEP.  No remedial action was taken even though all of her managers admittedly knew that she was being subjected to discrimination and harassment.

4.     As a result, Toomey's mental and emotional wellbeing suffered tremendously. She had severe anxiety at work and suffered debilitating panic attacks.

5.     She was forced to seek therapy and was prescribed anti-anxiety medication.  She also developed a throat-clearing tic that her colleagues proceeded to mock and make fun of.  This only exacerbated the tic, which became so severe that she sought help from a throat specialist and underwent therapy.

6.     When Toomey finally escalated her complaints to Chief Operating Officer Dora Stojka ("Stojka"), orally and then in the form of a letter, they could no longer be ignored.  Rather than act to ameliorate the situation, however, OEP fired Toomey within three weeks of her

3

submission of a formal complaint, a blatantly retaliatory gesture that was accompanied by absolutely no rational or remotely legitimate justification.

7.      Defendants' actions violated the 42 U.S.C. § 1981 ("Section 1981"), New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101 *et seq.* ("NYCHRL"); the New York State Human Rights Law, N.Y. Executive Law §§ 290 *et seq.* ("NYSHRL"); and New York tort law.

## JURISDICTION AND VENUE

8.      Jurisdiction of this Court is proper under 28 U.S.C. §§ 1331 and 1343.

9.      The Court has supplemental jurisdiction over Toomey's state and city law claims pursuant to 28 U.S.C. § 1367.

10.     Venue is proper in this district in that the events or omissions giving rise to the claims occurred within the Southern District of New York. 28 U.S.C. § 1391(b).

## ADMINISTRATIVE PREREQUISITES

11.     Toomey will file a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), and she will move for leave to file an Amended Complaint alleging violations of Title VII of the Civil Rights Act of 1964 ("Title VII") following the EEOC's issuance of a Notice of Right to Sue.

12.     Pursuant to NYCHRL § 8-502, Toomey will serve a copy of this Complaint upon the New York City Commission on Human Rights and the Corporation Counsel of the City of New York.

## PARTIES

13.     Toomey is a resident of the State of New York.

14.     Toomey was and is a "person" and an "employee" of One Equity Partners and entitled to protection as defined by the NYSHRL and the NYCHRL.

15.     One Equity Partners is a company headquartered in New York state.  Upon information and belief, One Equity Partners is incorporated in Ontario, Canada.

16.     One Equity Partners is an "employer" and employs the statutory requirement of employees to be considered an employer under the NYSHRL and the NYCHRL.

## MATERIAL FACTS

### I.     BACKGROUND

17.     Toomey is a woman of Lebanese Arab descent.

18.     Before joining OEP, Toomey had a stellar and varied resume that including extensive experience as an Executive Assistant ("EA").

19.     In 2002, Toomey started her exemplary career with the Ritz Carlton Hotel Company ("Ritz") as Supervisor for the 5 Star Spa Resort in Naples, Florida.

20.     Toomey took several years off to create a global food and beverage start-up manufacturing company but was asked to return to the Ritz as Senior EA to the Executive Chef in 2013, where she managed all administrative duties for the culinary team and the J-1 visa program.

21.     In 2015, Toomey joined HIS Markit Ltd. ("HIS") as the Senior EA to the Executive Vice President, General Counsel, Chief Administrative Officer, Chief Information Security Officer and Head of Investor Relations.

22.     In 2021, Toomey transitioned to Lyons & Lyons Law as the Senior Legal EA, where she maintained client files, managed expenses and filed legal documents.

23.     Toomey therefore has extensive experience working in a variety of EA roles and has excelled in a variety of workplaces.

24.     In or around May 2022, Maria Spratt ("Spratt"), Toomey's longtime friend and OEP employee, suggested that Ms. Toomey apply for a role at OEP.

25.     Toomey applied for the role of EA to the Investor Relations Team at OEP and underwent a four-round, three-week interview process following her introduction to the Company.

26.     Toomey was finally offered the position on June 1, 2022, and relocated from Naples, Florida to New York City to work for OEP.

## II.   **TOOMEY JOINS OEP**

27.     On June 20, 2022, Toomey began working at OEP, where the New York City office occupies two floors at 510 Madison Avenue.

28.     The Investor Relations ("IR") team—comprised of Lippin, Partner and Head of Investor Relations, Grace Ma ("Ma"), VP of Investor Relations and Derek Menker ("Menker"), Associate, IR—shares the 18th floor with President Belinfanti, EA O'Connell and Partner Inna Etinberg ("Etinberg"), among other OEP employees.

29.     Toomey was seated next to O'Connell, an experienced EA and long-time OEP employee.

30.     Initially, Toomey was excited to be seated next to O'Connell, believing that O'Connell would guide her through a smooth transition to OEP.

31.     However, she quickly discovered that O'Connell, like OEP as a whole, was far from welcoming.

32.     Indeed, both Toomey's interactions with O'Connell and her time at OEP were marred instead by verbal abuse, misogyny and discrimination.

33.     Beyond her role as an executive assistant to the IR team, Toomey was tasked with leading the planning for the Firm's Annual General Meeting ("AGM"), along with other events throughout the year.

34.     With her extensive event-planning background, Toomey saw planning the AGM as a prime opportunity to showcase her abilities and establish herself as a valuable employee from the outset.

35.     In or about September 2022, Toomey and Porreca, EA to then-President Cashin, began preparations for the 2022 AGM.

36.     Much to Toomey's dismay, Porreca informed Toomey that she did not want her involved.

37.     Instead, Porreca designated O'Connell as her "planning partner," excluding Toomey from the process.

38.     This conflicted with instructions from Lippin, Toomey's boss, who had explicitly asked her to lead the AGM planning.

39.     Nevertheless, Porreca and O'Connell reduced Toomey's role to that of an assistant, expecting her to fetch food and observe while they took charge.

40.     As a new employee, Toomey tried to remain focused on her responsibilities and ignore the dismissive behavior.

41.     This was impossible, unfortunately, as Porreca and O'Connell made abusive comments toward her.  Moreover, these comments were highly offensive and discriminatory in nature.

42.     On several occasions, O'Connell described Arab-Americans as "cheap" and "disgusting" within earshot of Toomey.  O'Connell made similar comments regarding Jewish people.

43.     O'Connell also held phone conversations with her husband calling Toomey a "bitch" and making comments about her appearance, such that Toomey could hear.

44.     Toomey reported the mistreatment to Lippin, explaining that she was being excluded from AGM planning and subjected to offensive remarks.

45.     Lippin assured Toomey that he would address the issue but failed to follow through.

### III.     TOOMEY IS RELENTLESSLY HARASSED AND INTIMIDATED

46.     Toomey tried her best to keep her head down and focus on her work, but she continued to face abusive and discriminatory behavior.

47.     O'Connell often snooped through Belinfanti's emails, sharing her discoveries with her husband over the phone or discussing them with colleagues.  When Toomey confronted O'Connell about this behavior, O'Connell responded with threats such as "Mind your business, bitch," or "I'll beat the shit out of you, stupid Arab."

48.     These were not isolated incidents.  Toomey was regularly subjected to this racist and gendered language in the work environment at OEP.

49.     O'Connell called Lippin a "cheap Jew" and Belinfanti a "cheap Jamaican."

50.     O'Connell made these comments publicly at EA dinners, in front of Porreca and at her desk.

51.     O'Connell regularly told employees that Spratt took antidepressant medication and was "wacko" and that she should retire because she is getting old (Spratt is 68 years old).

52.     In or around the summer of 2022, Bernard, a Black EA, flew to her native Panama to visit her ill brother.

53.     O'Connell told employees that "[Bernard was] probably making this shit up to go on an extended vacation because that's what her people [i.e., people of color] do."

54.     Toomey was horrified by O'Connell's comments.

55.     As an Arab Lebanese woman, Toomey constantly felt threatened by O'Connell's behavior.

56.     O'Connell and Porreca regularly commented on Toomey's looks—often scrutinizing Toomey's clothing, hairstyle and makeup.

57.     On one occasion, Porreca asked Toomey, "Your eyebrows are very dark and thick.  Did you color them? You might want to check in the bathroom mirror."

58.     This comment clearly played on racial stereotypes regarding women of Mediterranean or Arab descent and body hair.

59.     On another occasion, O'Connell and Porreca told Toomey that she was only hired because "senior management didn't want any young, beautiful women working [at the Company] for fear of temptation."

60.     Regrettably, despite the discriminatory critiques of Toomey's age and appearance, Toomey also was subjected to sexual harassment by senior members of the Firm.

61.     Indeed, throughout Toomey's entire tenure at OEP, then-President Cashin routinely made misogynistic and harassing comments about the women at the Company.

62.     Cashin's remarks went beyond casual offhand comments, reflecting a consistent pattern of demeaning behavior that fostered a hostile work environment.

63.     Cashin's statements not only disrespected female colleagues but also emboldened others to perpetuate discriminatory attitudes and practices across the Firm.

64.     Cashin frequently commented on male superiority, stating that he preferred not to hire women with intellectually demanding jobs, like jobs in Investor Relations and that OEP should only hire women (particularly mothers) for "unintellectual jobs" like the one held by Toomey.

65.     Moreover, during one all-firm meeting, OEP invited a Futurist from Oxford to speak to the employees.  When the Futurist noted that women tend to do better in school than men, Cashin interrupted and openly espoused the belief that women are intellectually inferior. Specifically, he said that "women cannot do better than men in real schools, like Harvard," and that "men must outperform women."

66.     Cashin would often stand by Toomey's desk, place his hand firmly on her shoulder, and say, "Dianna, David [Lippin] thinks you are great and doing such a good job. So glad you are here with us!"

67.     While this comment was in the guise of praise, it made Toomey uncomfortable and anxious about receiving any further recognition from Cashin.  The unwanted physical contact made her dread interactions with Cashin, as they created an environment where personal boundaries were not respected.

68.     Other times, Cashin would approach Toomey's desk and ask, "Dianna, don't we prefer skinny EAs over fat EAs?"  These comments left Toomey feeling deeply humiliated, as Cashin's unwelcome remarks about her body violated her sense of dignity and professionalism, reducing her worth to her superficial appearance rather than her skills or contributions.

69.     During an employee's birthday celebration with cupcakes on the 19th floor, Cashin stated, "Don't we prefer a thin Maureen [O'Connell] over a fat Maureen [O'Connell]?" His remark was made in front of the entire Firm.

70.     Such comments from OEP's president signaled to other employees that demeaning and harassing colleagues was acceptable behavior.

71.     Over time, Toomey developed severe anxiety at work, particularly around Porreca and O'Connell.

72.     Toomey suffered debilitating panic attacks and developed a throat-clearing tic as a manifestation of her stress.

73.     O'Connell regularly mocked her tic, laughing at her, mimicking it and ridiculing her.

74.     On several occasions, O'Connell told colleagues that Toomey was "driving her crazy" and called her a "hacker," which only intensified Toomey's anxiety.

75.     Toomey's tic became so severe that she sought help from a throat specialist and underwent therapy.

76.     Despite the hostile environment, Toomey thrived in her role, consistently exceeding Lippin's expectations.

77.     Toomey's 2022 year-end review was filled with positive feedback, earning her a salary increase and the maximum 20% bonus.  Additionally, Lippin personally wrote her a $1,000 check and Ma presented her with a $250 gift card for her excellent job performance.

## IV.     TOOMEY'S COMPLAINTS GO IGNORED

78.     In or about February 2023, the annual process of AGM planning began again.

79.     Once again, Porreca and O'Connell sidelined Toomey.

80.    Porreca secured the venue, the Lotte Palace, without consulting Toomey, and proceeded to organize other event details with O'Connell.

81.    When Toomey informed them that Lippin had specifically requested her involvement in AGM planning, Porreca and O'Connell dismissed her, scoffing that "Lippin doesn't have the balls," "he's a wuss" and that "[he's] insignificant at this firm; Dick[] and Greg[] wanted to fire him years ago for poor performance, so his opinion is worthless."

82.    It was evident to Toomey that their behavior was intended to exclude her and diminish her role within the Firm.

83.    Toomey again reported their harassment to Lippin because she was truly fearful of Porreca and O'Connell.

84.    Unfortunately, Lippin told Toomey that "he was busy and they could talk about it later."

85.    Lippin never asked Toomey about it again, and upon information and belief Lippin took no remedial action.

86.    Toomey also confided in Spratt, who was appalled by the treatment Toomey had been enduring.

87.    Spratt urged Toomey to report O'Connell and Porreca's behavior immediately.

88.    Incredibly, however, OEP has no HR department or personnel.  As such, there is no obvious mechanism for reporting instances of discrimination.  The closest thing that OEP has to HR is Stojka, the Firm's Chief Operating Officer.

89.    Toomey hesitated to escalate the issue to Stojka, however, because O'Connell, Porreca and Stojka had all worked together at OEP for 15 years.

90.     Furthermore, Toomey had already complained to her direct manager, her complaint had been dismissed, and nothing had been done.

91.     Spratt, knowing that Toomey was afraid to complain to Stojka, but fully aware of how poorly Toomey was being treated, took it upon herself to report the abuse directly to Stojka, emphasizing the urgency of addressing the situation and advocating for immediate action.  Spratt specifically asked Stojka to reach out to Toomey.

92.     Stojka never reached out to Toomey.

93.     In July 2023, Cashin was accused of violating SEC regulations by leaking confidential information to investors about OEP deals.

94.     Allegedly, David Han ("Han"), a former Senior Partner, exposed Cashin's misconduct to the media after confronting him over the improper actions.

95.     Following the altercation, Han was terminated in retaliation for reporting the misconduct.

96.     Han filed a lawsuit against OEP following his termination, escalating tensions within the office.

97.     O'Connell became even more emboldened by Han's firing and Cashin's downfall, as Belinfanti emerged as the frontrunner to be the next OEP President.  O'Connell would walk into the office on both floors on occasion and say "what's up bitches."

98.     O'Connell openly expressed worries that Belinfante would take away her "perks" because he was "Black" and a "cheap Jamaican."

99.     Once Belinfante became president, O'Connell began to threaten Toomey when she spoke to O'Connell's team or to Belinfante.

100.    As tensions with O'Connell mounted, Toomey confided in Spratt and Bernard, who urged her to report the harassment.

101.    However, given her prior experiences, Toomey feared this would only exacerbate O'Connell's abusive behavior.

102.    In August 2023, Toomey received permission from Lippin to work remotely for two weeks, in line with the Firm's policy.

103.    Toomey was then reprimanded by O'Connell for working remotely upon her return.

104.    O'Connell ceased speaking to Toomey at all, and she would not respond to emails or other communications concerning work-related matters.

105.    O'Connell also began openly telling others in the office that Toomey was "dumb" and "d[idn't] know how to do anything."

106.    Toomey's health only continued to worsen.  She started feeling sick every day with stomach aches and headaches, and her panic attacks got more severe.

107.    On several occasions, Toomey began crying at the office and had to leave.

108.    In addition, as a result of OEP's refusal to take appropriate remedial action, throughout 2023, Toomey continued to be victimized by discriminatory harassment.

109.    Porreca ordered lunch for a weekly meeting.  Several times, she ordered from Naya, which is a Lebanese restaurant.

110.    On these occasions, O'Connell would make discriminatory comments about Lebanese food and people, including, "Lebanese food is disgusting like the people, I don't eat terrorist food and Greg doesn't like it either."

111.   Toomey complained to Porreca and Ma about these comments but was told to ignore them.

112.   Things got worse after Hamas invaded Israel in October 2023.

113.   The discriminatory comments about Arab Americans and terrorism increased, and O'Connell began to ostracize Toomey.

114.   O'Connell told her husband on the phone, again within earshot of Toomey, that Toomey was a "dirty terrorist" who was "overstepping her role," and that she would "put an end to it."

115.    O'Connell refused to step into the elevator, the bathroom or the office kitchen with Toomey.

116.   Whenever Toomey and O'Connell crossed paths, O'Connell shot Toomey looks of disgust.

117.   This was demoralizing, intimidating and threatening.

118.   Despite the continuing discriminatory harassment, Toomey continued to excel in her role.

119.   In January 2024, she received another outstanding performance review, a salary increase and a full 20% bonus.

120.   Moreover, Lippin wrote Toomey a card that reads, "Thank you so much for everything you do for me and the IR team!  I really appreciate you being so proactive and supportive of the team.  We have an important year ahead of us and **I'm looking forward to many more successes together in 2024!**"

121.    Menker gave Toomey a gift of cash and wrote her a card that said, "Thank you for all you do for our team.  Things would not run smoothly without you.  Happy Holidays and see you in the New Year!"

122.    Another Partner, Vittorio Palladino, wrote to Toomey, "Thank you for all your support here in New York.  I will miss you in Italy."  Palladino also took her to an expensive lunch at Nobu in recognition of her excellent work.

123.    Ma gave Toomey a Delta Airlines Gift Card for $300 with a note that read, "Thank you so much for everything that you do—I really appreciate how reliable and on top of everything you are."

## V.    TOOMEY MAKES A FORMAL COMPLAINT

124.    In January 2024, Belinfanti took over as the President of OEP.

125.    Like Cashin, Belinfanti is also a misogynist who was open about his discriminatory treatment of women.

126.    Belinfanti made repeated comments such as, "I would never meet alone with women" and "I would never meet 1-1 with a woman with a closed door.  That is just an invitation to a lawsuit."

127.    To that end, Belinfanti would only allow women to enter a short distance into his office.

128.    Belinfanti would not ride with women in cars alone.  He left one OEP AE in tears after he kicked her out of a ride service that had been paid for by the Firm because he would not be in a car with a woman.

129.    On January 30, 2024, O'Connell publicly berated Toomey for booking a car service for Belinfanti and Ma—a task that Ma specifically asked Toomey to perform.

16

130.     Having reached her limit with the ongoing bullying, and having gotten nowhere with Lippin, Toomey went to Ma's office in tears and confided that she could no longer endure the years-long harassment.

131.     To her surprise, Ma admitted to being aware of the issues between Toomey and O'Connell and confirmed that Lippin knew as well.

132.     Both Lippin and Ma had been complicit in Toomey's abuse throughout her tenure.

133.     Neither Lippin nor Ma ever took action to help Toomey.

134.     Toomey was shocked that nobody at the Firm would offer her help.

135.     Ma specifically implored Toomey not to inform Stojka about O'Connell's discriminatory comments, explaining that complaining would be futile because O'Connell was protected by Belinfanti.

136.     Instead, Ma suggested Toomey keep her head down and ignore the discriminatory harassment.

137.     Feeling defeated and unsupported, Toomey was left vulnerable to continued abuse.

138.     In February 2024, Toomey again attempted to schedule a meeting with Stojka to address her concerns.

139.     Stojka repeatedly canceled or rescheduled the meeting until Toomey realized the meeting would never happen.

140.     Meanwhile, O'Connell continued her campaign of isolation and intimidation, sabotaging Toomey's work, rescheduling candidate interviews without her knowledge and

whispering behind her back.  O'Connell would frequently use profanity to disparage Toomey, saying things like, "Fuck that bitch," or "Fuck that," in response to her suggestions.

141.    By February 2024, Toomey's anxiety and panic attacks had worsened.

142.    Toomey decided to seek therapy to develop coping skills and build the courage to finally report her experiences to Stojka.

143.    On February 11, 2024, Toomey attended her first therapy session and was prescribed anti-anxiety medication.

144.    Toomey's anxiety and emotional distress did not improve because she continued to be victimized by discriminatory comments, conduct and bullying.

145.    As such, on or around March 25, 2024, Toomey called Stojka and reported the years of abuse and harassment she endured at OEP.

146.    Following that call, Toomey sent Stojka a letter summarizing many of her key complaints, including explicit complaints about discrimination.

147.    Stojka represented to Toomey that a "full investigation" would be done and that she would "get back to" Toomey.

148.    Toomey did not hear back from Stojka for almost three weeks.

149.    Upon information and belief, Stojka immediately had conversations with O'Connell and Belinfanti instead of conducting an investigation.

150.    As a result, Belinfanti stopped looking at or speaking to Toomey, where he had once made small talk.

151.    Belinfanti and O'Connell also engaged in several closed-door meetings, which had not occurred before.

152.    On or about April 19, 2024, Toomey called Stojka to ask for an update on the status of her complaint.

153.    During the call, Stojka told Toomey none of her complaints could be substantiated.

154.    This was an outrageous assessment given how openly OEP discriminated against Toomey.

155.    Stojka then informed Toomey that she should not bother coming to work Monday because she was being terminated.

156.    The purported basis for the decision to terminate Toomey was that she was "no longer a good fit" and that "nobody really liked" her.  Toomey attempted to plead her case, but Stojka cut her off and told her to "stop" because the "decision ha[d] been made and it [wasn't] going to change."

157.    Stojka also told Toomey that nobody believed that she was good at her job, a blatant lie disproved by the positive performance review, bonus, raise and letters she had received just weeks earlier.

158.    It could not be clearer that Toomey was fired for complaining about OEP's unlawful misconduct.

159.    Immediately after OEP illegally terminated Toomey, Stojka disclosed the fact of Toomey's termination to Spratt and Bernard in an effort to further disparage Toomey.

160.    On April 22, 2024, Toomey challenged the reasons for her purported termination in a call with Stojka.

161.    Stojka then changed the reasons for terminating Toomey, stating that Toomey was unhappy and Stojka thought it was best that Toomey leave.

162.     Stojka admitted on that call that Toomey "would have had a long career with [OEP] if you would have just kept your head down and your mouth quiet and didn't stir up trouble."

163.     This is a direct admission of an unlawful retaliation.

164.     Also on that call, Stojka encouraged Toomey not to retain counsel.

## VI.     TOOMEY RETAINS COUNSEL AND IS SUBJECTED TO FURTHER RETALIATION

165.     On April 26, 2024, Wigdor LLP put OEP on notice that Toomey had retained the firm to commence litigation.

166.     OEP then told employees that they could not contact Toomey for any reason.

167.     OEP also began telling employees that Toomey was fired for poor performance, yet another change in the purported rationale behind Toomey's termination.

**FIRST CAUSE OF ACTION**
**(Discrimination and Harassment in Violation of Section 1981)**

168.     Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein.

169.     Defendant has discriminated against Plaintiff on the "but for" basis and because of her race and ethnicity (Arab) in violation of Section 1981 by denying her the same terms and conditions of employment available to non-Arab employees, including, but not limited to, subjecting her to disparate working conditions, denying her terms and conditions of employment equal to that of her co-workers who do not belong to the same protected categories, subjecting her to a hostile work environment, terminating her employment and denying her the opportunity to work in an employment setting free of unlawful discrimination and harassment.

170.    Defendant has discriminated against Plaintiff on the basis of her race and ethnicity in violation of Section 1981 by fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment that has included, among other things, frequent, severe and pervasive discrimination and harassment.

171.    As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of damages.

172.    As a direct and proximate result of Defendant's unlawful discriminatory conduct and harassment in violation of Section 1981, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, including but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence and emotional pain and suffering, for which she is entitled to an award of damages and other relief.

173.    Defendant's unlawful and discriminatory actions constitute malicious, willful, and wanton violations of Section 1981, for which Plaintiff is entitled to an award of punitive damages.

**<u>SECOND CAUSE OF ACTION</u>**
**(Retaliation in Violation of Section 1981)**

174.    Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein.

175.    Defendant retaliated against Plaintiff by, inter alia, terminating her employment on the "but for" basis and because of her engagement in activities protected under Section 1981.

176.    As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of damages.

177.    As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, including but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence and emotional pain and suffering, for which she is entitled to an award of damages.

178.    Defendant's unlawful and retaliatory actions constitute malicious, willful, and wanton violations of Section 1981, for which Plaintiff is entitled to an award of punitive damages.

## THIRD CAUSE OF ACTION
### (Sex Discrimination/Sexual Harassment/Hostile
### Work Environment Under the NYSHRL)

179.    Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

180.    Defendant has discriminated against Plaintiff on the basis of gender in violation of the NYSHRL by, inter alia, subjecting her to an unlawful hostile work environment, discriminatory disparate treatment and sexual harassment.

181.    As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

182.    As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem, loss of self-confidence and emotional pain and suffering, for which she is entitled to an award of monetary relief and other relief.

183.    Defendant's unlawful discriminatory actions constitute malicious, willful and wanton violations of the NYSHRL for which Plaintiff is entitled to an award of punitive damages.

## FOURTH CAUSE OF ACTION
### (Race/National Origin Discrimination Under the NYSHRL)

184.    Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

185.    Defendant has discriminated against Plaintiff on the basis of her race and/or national origin in violation of the NYSHRL by, inter alia, subjecting her to an unlawful hostile work environment and discriminatory disparate treatment.

186.    As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

187.    As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem, loss of self-confidence and emotional pain and suffering, for which she is entitled to an award of monetary relief and other relief.

188.    Defendant's unlawful discriminatory actions constitute malicious, willful and wanton violations of the NYSHRL for which Plaintiff is entitled to an award of punitive damages.

**FIFTH CAUSE OF ACTION**
**(Retaliation Under the NYSHRL)**

189.    Plaintiff hereby repeats, reiterates and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

190.    By the actions described above, among others, Defendant retaliated against Plaintiff in violation of the NYSHRL because she protested unlawful discrimination and/or harassment.

191.    As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

192.    As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem, loss of self-confidence and emotional pain and suffering, for which she is entitled to an award of monetary relief and other relief.

193.    Defendant's unlawful retaliatory actions constitute malicious, willful and wanton violations of the NYSHRL for which Plaintiff is entitled to an award of punitive damages.

**SIXTH CAUSE OF ACTION**
**(Sex Discrimination/Sexual Harassment/Hostile Work**
**Environment Under the NYCHRL)**

194.    Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

195.    Defendant discriminated against Plaintiff on the basis of her gender in violation of the NYCHRL by subjecting Plaintiff to disparate treatment based upon her gender, including, but

not limited to, subjecting her to an unlawful hostile work environment, discriminatory disparate treatment, and sexual harassment.

196.   As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

197.   As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

198.   Defendant's unlawful and discriminatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NYCHRL for which Plaintiff is entitled to an award of punitive damages.

## SEVENTH CAUSE OF ACTION
### (Race/National Origin Discrimination Under the NYCHRL)

199.   Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

200.   Defendant discriminated against Plaintiff on the basis of her race and/or national origin in violation of the NYCHRL by subjecting Plaintiff to disparate treatment based upon her race and/or national origin, including, but not limited to, subjecting her to an unlawful hostile work environment and discriminatory disparate treatment.

201.   As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

202.    As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

203.    Defendant's unlawful and discriminatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NYCHRL for which Plaintiff is entitled to an award of punitive damages.

## EIGHTH CAUSE OF ACTION
### (Retaliation Under the NYCHRL)

204.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

205.    By the actions described above, among others, Defendant retaliated against Plaintiff in violation of the NYCHRL because she protested unlawful discrimination and/or harassment.

206.    As a direct and proximate result of the unlawful conduct, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled to an award of monetary damages and other relief.

207.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

208.    Defendant's retaliatory actions were willfully negligent, reckless and/or committed with a conscious or reckless disregard of Plaintiff's rights under the NYCHRL.

26

## PRAYER FOR RELIEF

**WHEREFORE**, Toomey prays that the Court enters judgment in her favor and against One Equity Partners for the following relief:

A.      A declaratory judgment that the actions of Defendant complained of herein violate the laws of the United States, the State of New York and City of New York;

B.      An injunction and order permanently restraining Defendant from engaging in such unlawful conduct;

C.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages, including but not limited to past and future lost earnings;

D.      An award of damages against Defendant, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including but not limited to emotional pain and suffering and emotional distress;

E.      An award of damages against Defendant, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for harm to her professional and personal reputations and loss of career fulfillment;

F.      An award of punitive damages in an amount to be determined at trial;

G.      Prejudgment interest on all amounts due;

H.      Reinstatement;

I.      Front pay;

J.      An award of attorneys' fees and costs that Plaintiff has incurred in this action to the fullest extent permitted by law; and

K.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated:  May 29, 2024
New York, New York

Respectfully submitted,

**WIGDOR LLP**

By: _____
Michael J. Willemin
William R. Baker

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
mwillemin@wigdorlaw.com
wbaker@wigdorlaw.com

*Counsel for Plaintiff*